# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BOLTON "BUCK" MORRISON, JR. and
CAPRESOURCE: THE CAPITAL RESOURCE
GROUP, INC.,

          Plaintiffs,

v.                                      CIVIL CASE NO. 05-60025
                                         HON. MARIANNE O. BATTANI

RELATIONAL, LLC,

          Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART,
## AND DENYING IN PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment against Capital Resource

Group, LLC (Doc. #25), and Defendant's Motion for Summary Judgment against Bolton "Buck"

Morrison, Jr., (Doc. #26).  Capresource alleges that Relational, LLC breached certain sales

contracts by failing to pay commissions and by refusing to compensate it for tax liabilities it

believes it will incur as a result of several "wrap lease" transactions that the parties entered.

Similarly, Morrison alleges that Relational, LLC, his former employer, breached his employment

contracts by failing to pay sales commissions he claims were due.  Morrison also alleges

Relational wrongfully discharged him from his employment, tortiously interfered with his

relationships with clients of his company, CapreSource, and discriminated against him based on his age.[1]

## II.    STATEMENT OF FACTS

CapreSource: The Capital Resource Group ("CCRG") was formed in 1988 by Bolton "Buck" Morrison to locate customers who wanted wanting to lease computer equipment and then match them with a computer leasing company that would agree to finance the lease. Morrison is, and has always been, CCRG's only employee. On March 7, 1988, CCRG entered into two agreements with Starwood Corporation ("Starwood") a computer leasing company. One agreement, the "Master Agreement, Purchase and Sale/Assignment, Assumption & Indemnity," governed the buying and selling of lease financing transactions between Starwood and CCRG. Dep. of Livingston at 23-24; Master Agreement. The other agreement, called the "Marketing Agreement," governed management of the lease, remarketing at the end of the lease term, and CCRG's compensation for lease origination and remarketing. Dep. of Livingston at 23-24; Dep. of Morrison at 55-56; Marketing Agreement. Until Starwood was sold to Relational on October 1, 1996, the Master Agreement and Marketing Agreement governed all transactions between Starwood and CCRG. Dep. of Morrison at 59; Dep. of Livingston at 6-8. CCRG and Starwood's relationship was not exclusive; if Starwood refused to finance a transaction, CCRG was free to take the transaction to another leasing company. Dep. of Livingston at 16-17.

---

[1] Morrison has agreed to dismiss his wrongful termination and tortious interference claims, and CCRG has agreed to dismiss its breach of contract claims based on reassignment of the LSI portfolio, and Relational's alleged liability for taxes on the wrap leases. Pursuant to a September 22, 2006, Order, the Court granted partial summary judgment in favor of Defendant, and dismissed Counts II & VI of Plaintiffs' Complaint, which stated claims of age discrimination and a violation of the Michigan Sales Representative Commission Act.

Under the Marketing Agreement, Starwood paid CCRG a lease origination fee "to be mutually agreed upon on a transaction-by-transaction basis, but not less than one-half of one percent (.5%) and not greater than three percent (3.0%) of the purchase price paid by SC" and 50% of the net interim rental paid by the lessee under the lease.[2]  Marketing Agreement, at para. 2.  Starwood also compensated CCRG for "remarketing," which is the sale, extension, renewal, or sublease of the equipment at the end of the lease term.  Id., at para. 3; Dep. of Livingston at 8-9.  If CCRG's remarketing efforts resulted in the value of the equipment exceeding a certain earning rate of Starwood's original investment, the account had residual value.  Id., at para. 3. When the net residuals (residual value less the remarketing costs) exceeded Starwood's investment, CCRG received forty percent (40%) of the excess.  Id.

The Marketing Agreement expired by its own terms after one year, but by agreement, the parties could extend the term of the Marketing Agreement for additional successive periods by appending a signature page notating the formation of a new "equipment pool."  Id., at para. 5. An equipment pool consisted of all equipment that Starwood acquired through lease financing transactions with CCRG during each calendar year.  Dep. of Morrison at 61-62; Marketing Agreement, at para. 3(A)(1).  The net residuals for each year were based on Starwood's investment in the equipment pool.  Id., at para.3(A)(4).  Starwood and CCRG entered into nine successive equipment pools under the Marketing Agreement.  Dep. of Morrison at 61-63.

---

[2] The "net interim rental" refers to the partial month's rental prior to commencement of the fixed term of the lease.

On October 1, 1996, Relational purchased Starwood.  Dep. of Livingston at 9.  Prior to the sale, Starwood principal Dave Livingston introduced Morrison to Relational's owners, Dan Flagstad and John Morand.  Id., at 9; Dep. of Morrison at 68-69.  At the meeting, there was no discussion about how Relational would compensate CCRG if the parties decided to do business together.  Dep. of Morrison at 76-77.  Livingston contends that continuation of business with CCRG was not part of the purchase agreement.  Dep. of Livingston at 29.  However, the Marketing Agreement, by its terms, continued to all successors and assigns.  Marketing Agreement, at 3.

Following the Starwood sale, Morrison called Flagstad on several occasions to discuss new leasing transactions.  Morrison contends that CCRG continued to cultivate business for Starwood in Canada, and that Canada was CCRG's exclusive territory.  Dep. of Morrison at 79.  However, the parties did not have a formal relationship regarding the compensation that CCRG would be paid for its services.  Id., at 102.  During the negotiation of those transactions, CCRG's compensation was not discussed.  Id., at 83- 84.  Relational paid CCRG a fee for each transaction, but those fees deviated from the Starwood Master Agreement.  Id., at 84-87.

On June 9, 1997, Morrison sent Relational a letter setting forth a proposal for CCRG's compensation for transactions between Relational and CCRG in the future.  Id., at 80.  As Morrison testified, "[a]s we got more familiar with each other and I decided that I would, in fact, engage in this relationship, I put together a letter which proposed the arrangements that I would like to have."  Id., at 76-77.

Relational asserts that the June 9th letter was a proposal, intended to present the terms that Morrison wanted going forward in the relationship.  The letter proposed the following:

4

> Compensation: 1% of everything done in Canada that I originate and close, to be pooled with 50/50 back-end sharing. If you reject the issue of back-end sharing, then 2% of everything I originate and close in Canada.
> As per my verbal agreement with Dan, 3/4% of everything done in Canada that flows directly to Schaumburg, like Bombardier and CDI Computer Dealers, with no back-end sharing.

June 9, 1997, Letter.

In the second paragraph of his compensation proposal, Morrison requested that Canada be the exclusive territory of CCRG, and that it receive a 3/4% lease origination fee for all business written in Canada even when it was not involved with negotiating or closing the transaction. Dep. of Morrison at 79-80 and 101-102.

Morrison did not hear back from Relational regarding his compensation until July 15, 1997. The July 15th letter, which is not signed by Flagstad, contains no language indicating that Relational agreed to CCRG's terms. Rather, the letter only promised to "provide you with a somewhat more formal comp plan shortly, but if you have thought of anything that we did not discuss last week, please let me know." When asked about the July 15th letter, Morrison testified that he did not receive a formal compensation plan in written form, and that he understood his proposed terms were accepted, and governed the parties' relationship deal by deal, until he became a Relational employee. Dep. of Morrison at 104-105. In April 1998, Morrison wrote Flagstad a letter referencing the fact that CCRG did not have a "sales plan or even a countersigned Purchase or Remarketing Agreement" for any of the deals done on behalf of Relational since November of 1996. Def.'s Ex. 7, Undated Letter from Morrison to Flagstad.

On January 28, 2000, Morrison became an employee of Relational. Morrison acknowledges that any business he closed after January 2000, would be as an employee of Relational, not as a CCRG independent contractor. Dep. of Morrison at 131. Morrison contends

that, although he was treated as a Relational employee for tax purposes, his compensation terms did not change.  He contends that in 2001, a formal employee contract was entered into that altered the compensation terms.  February 5, 2001, Letter from Relational to Morrison.  However, Morrison asserts that the contractual relationship between CCRG and Relational was governed by the 1988 Marketing Agreement.  Relational, on the other hand, asserts that the written contract governed Morrison's compensation for all transactions, except for certain transactions that involved a customer credit risk, questionable equipment residuals, or other non-standard leasing terms, even though those terms were not in the written contract.  Dep. of Roger Otto at 24 and 42-43.

Morrison was very successful in 2001, closing almost $30 million in transactions, exceeding his sales quotas.  At the end of the year, Relational hired two new sales representatives for its Toronto office.  At that time, Steve Glover approached Morrison and asked if Morrison would allow the representatives to take over some of his Canadian accounts.  According to Morrison, in 2002, 92% of his Canadian accounts were reassigned to the new sales representatives without his consent or input.  Dep. of Morrison at 192-93.  Also during 2002, Relational management, without Morrison's input or knowledge, entered into negotiations with one of his customers that resulted in the loss of a $6 million deal.

In May 2002, Morrison had concluded that CCRG was entitled to a number of commissions for transactions it had completed while it was working as an agent of Starwood.  On May 5, 2002, Morrison requested a meeting with Flagstad to resolve the outstanding commissions he claimed CCRG was owed.  Id., at 146-148.  Flagstad asked Morrison to itemize his issues in a memo for his review prior to the meeting.  Id., at 148.  On May 7, Morrison

6

provided Flagstad with a detailed accounting of the disputed commissions that totaled $96,098.40.

At their meeting on May 9, 2002, Flagstad agreed to pay almost every commission claim Morrison identified in the memo, with the exception of four or five outstanding accounts.  Dep. of Morrison at 150-154.  At the end of the meeting, Flagstad wrote CCRG a check for $75,701.36.  Id., at 151-152.  The next day, Morrison sent an email to his supervisor with a copy to Flagstad that reiterated the understanding that most of the outstanding commission issues were resolved, "leaving only 3-4 'old' deals to finalize (Canada Post, Co- Steel, two ATS schedules) . . . ."  May 10, 2002, email from Buck Morrison.

Relational contends that the 3-4 "old" deals that Morrison referenced were resolved as part of a second settlement in 2003.  On January 29, 2003, Morrison sent Nancy Brooke, Relational's Director of Commission Administration, an email that identified certain transactions that he believed Relational owed CCRG.  In his email, Morrison states, "[w]hen I am (finally) done, I will be owed about $126.7K for pooled deals, and will get a check to CCRG. . . .  After that we will be done with the pools, and Dan will be a bit happier."  Morrison email to Brooke dated January 29, 2003.  He further states, "[m]y Commission Report will reflect everything as altered by the combination of (1) my Settlement of 5/09/03 . . . ."  On April 13, 2003, Morrison emailed Brooke his full accounting of outstanding commissions to date.  These disputed commissions were supposed to be the end of any equipment pools that Morrison originated and closed through CCRG.

In March 2003, Plaintiff had his annual performance review, which was attended by Flagstad, Morand, Otto and Glover.  Dep. of Morrison at 174-175.  Morrison's sales method

focused on selling larger transactions to just a few customers, and after failing to make his quota in 2002, Glover, asked him to modify his sales method to develop a more diversified account portfolio. Id., at 172, 191-192. Morrison was reluctant to change his well-established, and previously successful strategy. Id. Nevertheless, his supervisors made it clear in the course of the multiple hour review that they were concerned about his performance and his ability to make his sales quota in 2003. Id., at 175. However, Morrison was not put on a performance review at that point. Id., at 180.

From May 12 through June 5, 2003, Morrison and Brooke engaged in frequent correspondence in an effort to clarify the amount of unpaid commissions. On June 6, 2003, Brooke notified Morrison that Flagstad approved an offer of $109,649.70 to settle CCRGs's claim for commissions owed in the amount of $115,940.00. Id., at 170-171. Morrison testified that payment took care of all the issues identified in his January 29, email. Id., at 171-172. However, earlier in his testimony Morrison inserted a caveat to that answer: that the resolution arrived at on June 6, 2003, only resolved any deals that he had complete information on as of January 29, 2003. Id., at 160.

By August 2003, Morrison's sales performance had not improved. Because his sales continued to fall well below quota, Glover put him on a probationary improvement plan. At the time the plan was issued, Morrison had written only $3.28 million of his $15 million sales quota. In addition to close monitoring, the probationary plan required that Morrison produce $5 million in new lease origination and develop two new accounts by October 31, 2003. Morrison understood that one consequence of his failure to meet these goals was termination. Id., at 181. Glover agreed to extend the time period for meeting quota from October 31, 2003, to December

8

31, 2003.  By the end of November, Morrison had written just one-half million in business --
10% of his quota.

On November 25, 2003, Relational fired Morrison.  Relational reassigned his remaining
accounts among the other sales representatives.  On December 17, 2004, Morrison and CCRG
filed suit against Relational, asserting a number of claims arising from Relational's alleged
failure to pay commissions, and Relational's allegedly discriminatory reasons for discharging
Morrison, including: 1) a claim for commissions CCRG earned while it was working as an agent
of Starwood; 2) a claim for 3/4% of every transaction closed by Relational in Canada; 3) a claim
for the residual commissions on the LSI account; and, 4) a claim for the tax liability that CCRG
would incur if it filed an income tax return for certain wrap lease transactions it entered into with
Starwood.

## III.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be
granted when "the pleadings, depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment,
after adequate time for discovery and upon motion, against a party who fails to make a
showing sufficient to establish the existence of an element essential to that party's case,
and on which that party will bear the burden of proof.
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of
material fact.  See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002).  "[T]he

9

burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to  support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)).  To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan

10

Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

## IV.    ANALYSIS

### A.    Plaintiffs' Breach of Sales Contract Claims.

Plaintiffs assert that Relational has only partially paid the contractually required fees and commissions for a period spanning 1988 through 2003.  Relational contends that CCRG's claims to unpaid commissions are foreclosed because the parties resolved any disputed claims to commissions through two accord and satisfactions.

In 1964, the Michigan Legislature enacted the Uniform Commercial Code ("UCC"), and in 1993 the Legislature added to Article 3 of the UCC a provision governing accord and satisfaction.  See Hoerstman General Contracting, Inc. v. Hahn, 711 N.W.2d 340, 345 (Mich. 2006).  Article 3, by its terms, is intended to apply to all negotiable instruments with limited exceptions.  The Michigan Supreme Court has held that MICH. COMP. LAWS ANN. § 440.3311 displaces the common law elements of an accord and satisfaction when, as here, a negotiable instrument such a check is used as payment of the debt.  Id., at 346.  The relevant portions of the UCC state:

> 1) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

11

(2) Unless subsection (3) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.
. . . .
(4) A claim is discharged if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim.

MICH. COMP. LAWS ANN. § 440.3311.

"The existence of an accord and satisfaction may be decided as a question of law if the facts of the case are undisputed and not open to opposing inferences." Hoerstman, 711 N.W.2d at 344. Pursuant to § 440.3311, "[t]he first requirement of an accord and satisfaction is a good-faith tender to the claimant as full satisfaction of the claim. . . . ." Id., at 347. "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." MICH. COMP. LAWS ANN. § 440.3103(1)(d). There is no argument that Relational was not acting in good faith when it tendered the check.

However, there is a dispute whether the check was tendered in full satisfaction of the debt. Relational contends that Morrison knew that the payment was in full satisfaction of all claims to outstanding commissions for deals made before the May 9, 2002, payment, with the exception of the four enumerated transactions identified in Morrison's subsequent email. Relational points to the following facts to support its argument: 1) Flagstad requested a memo before the meeting that outlined each claim; and 2) Morrison's email the day after the meeting that stated, in relevant part: "Essentially we cleared everything to date, leaving only 3-4 'old' deals to finalize . . . We cleared up every draw and every promissory note and every commission or fee outstanding . . . . "

12

CCRG, on the other hand, asserts that Relational never disputed that it owed CCRG commissions, and only requested the itemized memo because there were discrepancies in the arbitrage of the conversions between Canadian and U.S. dollars.  CCRG also contends that it did not know that the check was tendered in full satisfaction of all its claims to commissions, and that the parties did not stipulate to a new amount to satisfy the debt.

"An accord and satisfaction is an affirmative defense grounded in contract principles.  An accord is a contract and requires a meeting of the minds of those who enter into it."  Hoerstman, 711 N.W.2d at 344 (footnotes omitted).  Beyond the requirement that the parties agree that a substituted payment will extinguish a disputed debt, Michigan requires that, within a reasonable time before collection of the instrument was initiated, the claimant must be informed that the payment was tendered in full satisfaction of the claim.  MICH. COMP. LAWS ANN. § 440.3311(4).

The mere fact that Flagstad requested a memo outlining Morrison's claims does not prove beyond peradventure that Morrison knew that any resolution would be in full satisfaction of all CCRG's outstanding, but disputed, commissions.  Looking at the facts in a light most favorable to Morrison, it is a reasonable inference that Flagstad wanted an itemized list because he wanted to know the basis of the claims beforehand in order to substantiate those claims, and not because CCRG's commissions were disputed.  Moreover, Relational has not asserted that Flagstad, or anyone else, told Morrison before he accepted the check, that it was tendered was in full satisfaction of all the deals listed in the memo, or that CCRG could no longer seek future commissions should the itemized deals later produce additional commissions.

Likewise, looking at the facts in a light most favorable to Plaintiffs, the email Morrison sent the day after receiving payment creates a question of fact whether he knew, before accepting

13

the check, that the check would extinguish all of his commission claims.  In the email, Morrison thanked Flagstad for his cooperative attitude, but emphasized his belief that not all commission claims had been resolved.  Therefore, because the cited evidence does not establish Morrison's actual knowledge beforehand of an accord and satisfaction, and the check or an accompanying written communication did not contain a conspicuous statement to the effect that the check was in full satisfaction of all CCRG's claims, there is a question of fact whether the May 9, 2002, check constitutes an accord and satisfaction.

Relational also argues, however, that if the May 2002, payment did not extinguish all the outstanding commissions owed, then a June 2003, payment did.  Relational points to a series of emails between Morrison and Nancy Brooke, in which the parties negotiated the amount of commissions due, and Morrison's testimony in which he stated that the June 2003 agreement took care of all his outstanding commission claims that he had with Relational.  Morrison testified that the June 2003 agreement took care of all his commission claims.  However, earlier in the deposition, Morrison testified that he believed that all his commissions were taken care of at the time, but his claims were incomplete because he did not have all the information available at that time to determine what he was owed. Dep. of Morrison at  160.  Further, just as with the May 2002 payment, there is no evidence that Morrison actually knew that the check was tendered in full satisfaction of the claim, and that acceptance of the payment would forever foreclose any future claim to commissions, or ability to dispute the amount paid, for those deals.  And, as before, neither the check nor an accompanying written instrument, contain a conspicuous statement that the tender is an accord and satisfaction.  Therefore, Relational has not shown that there is no material question of fact that the tendered check was an accord and

14

satisfaction of CCRG's current or potential claims for commissions, and summary judgment is inappropriate.

Relational also contends that Morrison's individual claim for unpaid sales commissions were resolved by the May 2002, and June 2003, accord and satisfactions discussed above.  In his individual claim, Morrison alleges that he only received ½% of the origination fee on three Bell-Nexxia transactions, whereas he is entitled to 1%.  Again, Relational argues that any claim to commissions on those deals were foreclosed when he accepted the payments, and later acknowledged that it took care of all the commission claims he had with Relational at any point. However, Morrison contends that he didn't know at the time that he was only receiving ½% on those transactions, but has since learned Relational underpaid him.  For the reasons discussed above regarding the CCRG accord and satisfaction, there is a question whether Morrison had actual knowledge that the payments were intended as an accord and satisfaction, and not merely as payments he was otherwise entitled to in the normal course of business.

**B.      CCRG's Breach of Contract Claim**

CCRG claims that it is entitled to a 3/4% commission on every transaction closed in Canada, even if it had no involvement whatsoever in closing the deal.  It argues that Relational agreed to this proposed compensation term in a June 9, 1997, letter.  In the alternative, CCRG argues that even if Relational did not accept the proposed compensation terms, that an oral contract exists that include the terms in the June 9th letter.  Relational asserts that a contract was never formed because, at best, there was merely an offer and counteroffer between the parties. Relational also contends that Morrison's own correspondence, eight months after the exchange

15

of letters he now claims as the basis of the contract, establishes that no compensation agreement

was reached.

Morrison's June 9, 1997, letter stated in relevant part:

There are issues to be addressed:
. . . .
-Compensation, back-end sharing or no, expenses, title, etc.  Initial thoughts from
the hip:
    -Title:  General Manager, Canada
    -Compensation: 1% of everything done in Canada that I originate and
    close, to be pooled, with 50/50 back-end sharing.  If you reject the issue of
    back-end sharing, then 2% of everything I originate and close in Canada.
    -As per my verbal agreement with Dan, 3/4% of everything done in
    Canada that flows directly to Schaumburg, like Bombardier and CDI
    Computer Dealers, with no back-end sharing.
    -Expenses reimbursed for phones and office, etc. . . . .
    -The Capital Underwriters relationship: . . . .

This is very general, and I have actually given it much more thought than will be
evident in the verbiage . . . .

Relational's July 15, 1997, letter in response stated in relevant part:

There are many mundane, but necessary details that we need to work out.  I am
going to propose my own solution for them and just let me know if you have a
better idea.  They are as follows:
1. Starting date: Immediately.  I see no benefit to either of us by waiting.
2. Canadian office expenses: I need to know how much your office with Capital
Underwriters costs on a monthly basis.  I think you should just have Grant bill us
for the office and the actual expenses on a monthly basis. . . . .
. . . .
4.  Draw.  Do you want or need one?  Please advise. . . . .
. . . .
6.  How to compensate you for having a condo in Toronto: I think that you should
receive $100 Canadian per night for up to 9 nights per month (I usually expect 6).
. . . .
7.  General Travel - For trips up to Canada and general driving around, we will
pay you a car allowance of $400 U.S. per month also to be submitted with your
expense report.  Other travel will be paid for by FRC on an actual cost, pre-
approved (verbally or quick fax) basis. . . . .
8.  Car phone - Just submit your car phone bills (U.S. and Canada, with your
monthly expenses.

16

9.  General Office Expenses -  Just submit the bills with our monthly expenses.
10.  Compensation Plan - I will provide you with a somewhat more formal comp plan shortly, but if you have thought of anything that we did not discuss last week please let me know.  For now we will leave CDI in with the rest of Canada in terms of how you are compensated. . . . .

Once a party makes an offer, "an acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for the purpose."  Kraus v. Gerrish Township, 517 N.W.2d 756, 765 (Mich. Ct. App. 1994).  "A valid contract requires mutual assent on all essential terms."  Eerdmans v. Maki, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997).  "Mere discussions and negotiation cannot be a substitute for the formal requirements of a contract."  Id.  "Acceptance must be unambiguous and in strict conformance with the offer."  Id.  "'[A] proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews its, or assents to the modification suggested.'"  Harper Bldg. Co. v. Kaplan, 52 N.W.2d 536, 538 (Mich. 1952)(citation omitted).

The response letter is a counter-proposal because it is a proposal to accept terms that vary from Morrison's proposal.  See Harper Bldg. Co. v. Kaplan, 52 N.W.2d 536, 538 (Mich. 1952).  The response letter rejects the proposal of paying Morrison 3/4% of every deal done with CDI, and alters the terms of reimbursing Morrison for his condo expenses.  Because the response letter leaves those terms open for later agreement, it cannot be considered an enforceable agreement.

Whether the parties' correspondence evidences an agreement to agree is another matter.

A contract to make a subsequent contract is not per se unenforceable; in fact, it may be just as valid as any other contract.  1 Corbin, Contracts, § 29, p. 84; see

17

> Hansen v. Catsman, 371 Mich. 79, 123 N.W.2d 265 (1963).  Like any other
> contract, a contract to make a contract can fail for indefiniteness if the trier of fact
> finds that it does not include an essential term to be incorporated into the final
> contract.  Socony-Vacuum Oil Co., Inc., v. Waldo, 289 Mich. 316, 323, 286 N.W.
> 630 (1939).  Similarly, if the agreement is conditioned on the happening of a
> future event that, through no fault of the parties, never happens, liability does not
> attach.  Professional Facilities Corp. v. Marks, 373 Mich. 673, 678, 131 N.W.2d
> 60 (1964):  "The conditions upon which defendants' liability for a fee were to
> depend are not alleged to have been fulfilled at any time."

Opdyke Inv. Co. v. Norris Grain Co., 320 N.W.2d 836, 838 (Mich. 1982).  The response letter is

sufficient evidence that the parties agreed to enter into a business relationship, i.e., an agreement

to contract for employment pursuant to their "conversation of Wednesday evening of two weeks

ago."  However, Relational also stated that the "mundane, but necessary details" needed to be

hammered out.  Thus, the question remaining is whether the agreement to agree is enforceable.

Relational's response letter states that "the necessary details" need to be worked out.  The

Oxford English Dictionary defines essential as: "4. Absolutely necessary, indispensably

requisite."  The definition of necessary is: "1. a. Indispensable, vital, essential; requisite."  In

Relational's mind, according to the letter, the parties had not yet reached an agreement on all the

essential terms, and thus, the letters cannot be considered an agreement to agree.

However, Morrison also argues that even if the letters are not a written employment

contract, it is clear that an oral contract existed, and that the terms of that contract are contained

in his June 9 letter.  "'A meeting of the minds is judged by . . . looking to the express words of

the parties and their visible acts.'"  Universal Leaseway System, Inc v Herrud & Co., 115

N.W.2d 294 (Mich. 1962)(quoting Stanton v. Dachille, 463 N.W.2d 470, 484 (Mich. Ct. App.

1990).  CCRG and Relational did have an ongoing business relationship for four years until

Morrison formally became a Relational employee, and ceased generating business for Relational

18

through CCRG.  Although there may not be a formal, written contract governing CCRG's
compensation, etc., the conduct of the parties shows that they reached some agreement regarding
a compensation structure.  Therefore, there is a question of fact for the jury to determine what
terms governed their four-year business relationship.

> **C.      Morrison's Claims Based on the Procuring Cause Doctrine**

In Count IV of the Complaint, Morrison asserts a claim for post-termination commissions
based on the procuring cause doctrine.  Morrison contends that in Michigan, an agent is entitled
to recover his commissions whether or not he has personally concluded and completed the sale,
if his efforts were the procuring cause of the sale.  Morrison argues that he is entitled to post-
termination commissions because the contract language governing post-termination commissions
is ambiguous.  He argues that it is unclear whether he would continue to be paid on the funding
transaction as long as the leases are renewed, and that the remarketing commissions can be
interpreted to be a part of the eventual commissions of the signed leases schedules.  Relational
counters by arguing that the commission agreement is clear on its face, and pursuant to the
agreement, he is not entitled to post-termination remarketing commissions.

The applicable language in the employment contract reads as follows:

Remarketing Commission: 20% of all residual proceeds generated and collected
from the orginal Lessee in excess of RFC's threshold yield of 15%. . . . .
. . . .
Commissions are due and payable thirty days after the end of a calendar quarter.
If you are terminated for any reason, you will be paid within the quarter after
funding on any transactions having signed lease schedules at the time of
termination.  The maximum timeframe [sic] from termination to funding is ninety
days.  No remarketing commissions are due and payable after termination.

The cardinal rule of contract interpretation is to ascertain the intent of the parties.
However, the intent of parties is discerned from the agreement itself.

> [W]hen the language of an agreement leaves no doubt as to its meaning . . . it must be considered without regard to its extraneous facts.  The intention of the parties is to be deduced from the language employed by them.  The question is not what intention existed in the minds of the parties, but what intention was expressed in the language used; and where unambiguous, the terms of the [agreement] are conclusive.

Moore v. Kimball, 291 Mich. 455, 461 (1939), see also Quality Prods. & Concepts Co., v. Nagel Precision, Inc., 666 N.W.2d 251, 259 (Mich. 2003).  The courts "must look for the intent of the parties in the words used in the instrument."  Mich. Chandelier Co. v. Morse, 297 N.W. 64, 67 (Mich. 1941).

"If the contract language is clear and unambiguous, its meaning is a question of law.  Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact."  Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist., 550 N.W.2d 228, 237 (1996).  A contract which admits of but one interpretation is unambiguous.  Fragner v. Am. Cmty. Mut. Ins. Co., 502 N.W.2d 350, 352 (Mich. Ct. App. 1993).  "A contract is ambiguous if 'its words may reasonably be understood in different ways.'"  UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 414 (1998) (quoting Raska v. Farm Bureau Ins. Co., 314 N.W.2d 440, 441 (Mich. 1982).  If a contract is ambiguous, its meaning becomes a question of fact with the fact-finder trying to discern the parties' intent.  Id.  If any ambiguity exists in the contract, the Court may refer to extrinsic evidence to determine the intent of the parties, but any ambiguity in the language of the contract must be construed against its drafter.  United Rentals (N.A.), Inc. v. Keizer, 355 F.3d 399, 409 (6th Cir. 2004).  "Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations."  GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 818 (6th Cir. 1999); See also United Rentals, at 409.

To the extent that Morrison's claims are based on remarketing commissions that were not due and payable until after the date of his termination, they are unsupportable.  The contract language is clear and unambiguous:  If a transaction Morrison brokered did not yet generate remarketing commissions at the time of his termination, the contractual language forecloses him from seeking commissions from deals that he brokered that generated remarketing commissions after he was terminated.[3]

Relational also argues that, pursuant to the terms of the contract, Morrison is not entitled to any remarketing commissions for transactions that were due and payable, but not yet collected at the time of his termination.  "The terms of the contract between the principal and sales representative shall determine when a commission becomes due."  MICH. COMP. LAWS ANN. § 600.2961(2).  "Entitlement to posttermination commissions depends primarily upon the parties' intentions as determined from the contract and other circumstances."  Barber v. SMH (US), Inc., 509 N.W.2d 791, 796 (Mich. Ct. App. 1993).  Under the unambiguous terms of the contract, remarketing commissions arise after the proceeds generated and collected from the original lessee exceed Relational's threshold yield of 15%.  Once that threshold is met, the sales representative is entitled to 20% of all residual proceeds.  However, if Relational has not yet generated or collected the residual proceeds, no remarketing commission is due.  Further, if the remarketing commission is not yet due, even though the transaction will/ or has generated such a commission, the sales representative is not entitled to the commission after termination.  Under the clear language of the contract, remarketing commissions are not ripe for a sales rep to collect

---

[3] Morrison created a document wherein he outlined and identified his damages, and their origins.  This claim encompasses the "BMJ.01b" / Bell-Nexxia transactions.

until Relational has collected the payments from the lessee.  Thus, to the extent Morrison's

claims are based on unpaid commissions for transactions that Relational had yet to collect the

money from before his termination, his claims are DISMISSED.[4]

**V.      CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary

Judgment is **DENIED** in part, and **GRANTED** in part.  **IT IS FURTHER ORDERED THAT**

Count IV of Plaintiffs' Complaint is **DISMISSED.**

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: February 14, 2007


**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail

and/or the Court's ECF System.


s/Bernadette M. Thebolt
DEPUTY CLERK


---

[4] This encompasses the "BMJ.02a" / GENet transactions